IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**LINDA SIMS**                                                          **PLAINTIFF**

**v.**                        **Case No. 4:23-cv-00813-LPR**

**STATE FARM FIRE AND**
**CASUALTY COMPANY**                                      **DEFENDANT**

<u>**ORDER**</u>

This is an insurance case.  Plaintiff Linda Sims owns a home in Little Rock, Arkansas.[1]  In 2016, Ms. Sims purchased an insurance policy from Defendant State Farm Fire and Casualty Company to insure her home.[2]  In January of 2020, Ms. Sims's house sustained significant water damage.[3]  Both parties agree that the water came from a pipe located underneath Ms. Sims's house.[4]  Ms. Sims filed a claim with State Farm, but State Farm denied the claim in April of 2020.[5]

In April of 2023, Ms. Sims brought the instant suit, alleging that (1) State Farm breached the insurance policy by denying her claim, and (2) State Farm acted in bad faith.[6]  The case was originally brought in state court, but State Farm removed the case to federal court.[7]  Subsequently, the Court granted State Farm's request to dismiss Ms. Sims's claim for bad faith.[8]  Now pending before the Court is Defendant's Motion for Summary Judgment, which asks the Court to grant

---

[1] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 33) ¶ 1.

[2] *Id.*

[3] *See generally* Compl. (Doc. 2); *see also* Ex. E (Sims Decl.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 23–24.  Throughout this Order, pinpoint citations to Doc. 34-1 refer to the ECF page numbers as opposed to the document's self-identified page numbers.

[4] *See* Ex. 3 (Lopez Dep.) to Def.'s Mot. for Summ. J. (Doc. 27-3) at 1.

[5] *See* Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 33) ¶ 4.

[6] *See generally* Compl. (Doc. 2).  Ms. Sims also seeks special damages under Ark. Code Ann. § 23-79-208 for her breach of contract claim.  *See id.* ¶¶ 34–38.

[7] Notice of Removal (Doc. 1).

[8] *See* Nov. 2, 2023 Order (Doc. 14).

judgment in State Farm's favor on Ms. Sims's breach of contract claim.[9]  As set forth below, the Court GRANTS Defendant's Motion for Summary Judgment.[10]

## BACKGROUND

On summary judgment, the Court is supposed to consider the record in a very particular way.  First, the Court adopts and considers all undisputed facts.[11]  Second, as to each genuinely disputed fact that is material to the outcome of the case, the Court adopts and considers the version of the fact that is most favorable to the non-moving party.[12]  From these facts, the Court then draws all reasonable inferences that are most favorable to the non-moving party.[13]  The bottom line is that the story presented below is the most Plaintiff-friendly rendition of the facts that a reasonable jury could conclude occurred.

### I.    The Insurance Contract

Ms. Sims's home is located at 9908 Ramona Drive in Little Rock, Arkansas.[14]  The house was built in 1978, and Ms. Sims has owned the property since 1988.[15]  In 2016, Ms. Sims purchased an insurance policy from State Farm to insure her home.[16]  This homeowner's insurance policy was renewed yearly and was in effect in January of 2020.[17]  The sections of the insurance policy that are or might be relevant to this case are laid out below.

---

[9] Def.'s Mot. for Summ. J. (Doc. 27).

[10] Id.

[11] See Canning v. Creighton Univ., 995 F.3d 603, 610 (8th Cir. 2021).

[12] See Quinn v. St. Louis Cnty., 653 F.3d 745, 750 (8th Cir. 2011).  A fact is genuinely disputed only if a reasonable jury could decide the fact in favor of either Plaintiff or Defendant.  See Morrow v. United States, 47 F.4th 700, 704 (8th Cir. 2022).

[13] See Quinn, 653 F.3d at 750.

[14] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 33) ¶ 1.

[15] Ex. E (Sims Decl.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 23.

[16] Id.

[17] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 33) ¶ 1.

## SECTION I – LOSSES INSURED

### COVERAGE A – DWELLING

*We* will pay for accidental direct physical loss to the property described in Coverage A, unless the loss is excluded or limited in **SECTION I – LOSSES NOT INSURED** or otherwise excluded or limited in this policy.  However, loss does not include and *we* will not pay for, any ***diminution in value***.

### COVERAGE B – PERSONAL PROPERTY

*We* will pay for accidental direct physical loss to the property described in Coverage B caused by the following perils, unless the loss is excluded or limited in **SECTION I – LOSSES NOT INSURED** or otherwise excluded or limited in this policy.  However, loss does not include and *we* will not pay for, any ***diminution in value***.

\*\*\*

12. **Abrupt and accidental discharge or overflow** of water, steam, or sewage from within a plumbing, heating, air conditioning, or automatic fire protective sprinkler system, or from within a household appliance.

    This peril does not include loss:

    \*\*\*

    c.   that occurs or develops over a period of time and is caused by or resulting from:

         \*\*\*

         (2)   seepage or leakage of water, steam, or sewage that is:

               (a)   continuous;
               (b)   repeating;
               (c)   gradual;
               (d)   intermittent;
               (e)   slow; or
               (f)   trickling.

\*\*\*

## SECTION I – LOSSES NOT INSURED

1.   *We* will not pay for any loss to the property described in Coverage A that consists of, or is directly and immediately caused by, one or more of the perils

listed in items a. through m. below, regardless of whether the loss occurs abruptly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

\*\*\*

f.  seepage or leakage of water, steam, or sewage that occurs or develops over a period of time:

    (1)  and is:

        (a)  continuous;
        (b)  repeating;
        (c)  gradual;
        (d)  intermittent;
        (e)  slow; or
        (f)  trickling; and

    (2)  from a:

        (a)  heating, air conditioning, or automatic fire protective sprinkler system;

        (b)  household appliance; or

        (c)  plumbing system, including from, within or around any shower stall, shower bath, tub installation, or other plumbing fixture, including their walls, ceilings, or floors.

*We* also will not pay for losses arising from condensation or the presence of humidity, moisture, or vapor that occurs or develops over a period of time;

g.  wear, tear, decay, marring, scratching, deterioration, inherent vice, latent defect, or mechanical breakdown;

h.  corrosion, electrolysis, or rust[.]

\*\*\*

2.  *We* will not pay for, under any part of this policy, any loss that would not have occurred in the absence of one or more of the following excluded events. *We* will not pay for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs abruptly or gradually, involves isolated or widespread damage, occurs on or off the *residence premises*, arises from any natural or

external forces, or occurs as a result of any combination of these:

\*\*\*

c.  **Water**, meaning;

(1)  flood;

(2)  surface water.  This does not include water solely caused by the release of water from a swimming pool, spigot, sprinkler system, hose, or hydrant;

(3)  waves (including tidal wave, tsunami, and seiche);

(4)  tides or tidal water;

(5)  overflow of any body of water (including any release, escape, or rising of any body of water, or any water held, contained, controlled, or diverted by a dam, levee, dike, or any type of water containment, diversion, or flood control device);

(6)  spray or surge from any of the items c.(1) through c.(5) described above, all whether driven by wind or not;

(7)  water or sewage from outside the ***residence premises*** plumbing system that enters through sewers or drains, or water or sewage that enters into and overflows from within a sump pump, sump pump well, or any other system designed to remove subsurface water that is drained from the foundation area;

(8)  water or sewage below the surface of the ground, including water or sewage that exerts pressure on, or seeps or leaks though a ***building structure***, sidewalk, driveway, swimming pool, or other structure; or

(9)  material carried or otherwise moved by any of the water or sewage, as descried in items c.(1) through c.(8) above.[18]

## II.    The Incident

On the morning of January 12, 2020, Ms. Sims left her home to attend church.[19]  Shortly after arriving at church, Ms. Sims received a call from her grandson informing her that portions of

---

[18] Ex. 1 (Ins. Pol'y) to Def.'s Mot. for Summ. J. (Doc. 27-1) at 15–20.

[19] Ex. E (Sims Decl.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 23.

her home were flooded with water.[20]  Ms. Sims's grandson was not able to locate the source of the flooding at the time of the call.[21]  Ms. Sims told her grandson to shut off the water and rushed home.[22]  When Ms. Sims arrived home, water was flowing out of the front door.[23]  Ms. Sims entered her home and found flooding in several rooms.[24]  Prior to this incident, Ms. Sims had not seen any indications of water damage (e.g., floorboards buckling).[25]

Because Ms. Sims was unable to locate the source of the flooding, she hired a leak detection agency.[26]  On or around March 24, 2020, the leak detection agency determined that the water was coming from a pipe that ran underneath Ms. Sims's living room.[27]  Subsequently, Ms. Sims hired Alejandro Lopez to repair the pipe.[28]  The pipe was located about 16–18 inches below Ms. Sims's living room.[29]  To get to the pipe, Mr. Lopez had to break through a 4-inch concrete slab upon which Ms. Sims's house sat.[30]  Mr. Lopez then had to dig through rocks and dirt.[31]  Upon finding

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* at 24.

[24] *Id.*; *see also* Ex. 4 (Probst Expert Report) to Def.'s Mot. for Summ. J. (Doc. 27-4) at 9 (depicting a floor plan sketch showing areas of flooding).

[25] Ex. E (Sims Decl.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 24.

[26] *Id.*

[27] *Id.*; Ex. 4 (Probst Expert Report) to Def.'s Mot. for Summ. J. (Doc. 27-4) at 8.  There is a little confusion in the record regarding room names.  State Farm's expert (Mr. Probst) refers to the area where the leak was discovered as the "fireplace area" or the "entry fireplace area."  *See* Ex. 4 (Probst Expert Report) to Def.'s Mot. for Summ. J. (Doc. 27-4) at 4, 6, 9.  He calls a garage that was converted into a living area the "living room."  *Id.* at 6, 9.  But Ms. Sims calls the room where the leak was found her "living room."  Ex. E (Sims Decl.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 24.  For the sake of clarity, the Court will refer to the room where the leak was discovered as Ms. Sims's living room.

[28] Ex. A (Lopez Dep.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 2–3.

[29] *Id.* at 6.

[30] *Id.* at 2–3, 6, 10; Exs. B-1–B-3 (Pictures of the Leaky Pipe and Repair Work) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 11–13.

[31] Ex. A (Lopez Dep.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 6; Exs. B-1–B-3 (Pictures of the Leaky Pipe and Repair Work) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 11–13.

the pipe, Mr. Lopez noted that there was a hole in the pipe about one-eighth of an inch in size.[32] Mr. Lopez turned on the water, and water started to gush out of the hole in the pipe.[33]  Below is a picture taken by Mr. Lopez of the pipe with the water turned on.[34]

---

[32] Ex. A (Lopez Dep.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 5; *see also* Ex. B-2 (Picture of the Leaky Pipe) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 12.

[33] Ex. A (Lopez Dep.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 6–7; Ex. B-2 (Picture of the Leaky Pipe) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 12.

[34] Ex. B-2 (Picture of the Leaky Pipe) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 12.



PLAINTIFF'S EXHIBIT
**B-2**

SmisLinda 000022

According to Mr. Lopez, the pipe was old and had oxidation.[35]  The oxidation on the pipe can be seen in the photo above.  Mr. Lopez proceeded to repair the pipe.[36]  Afterwards, Mr. Lopez refilled the hole in the living room with the rocks and dirt that he had removed earlier.[37]

While at Ms. Sims's home, Mr. Lopez also discovered that multiple pipes in the attic had burst after a recent freeze.[38]  According to Mr. Lopez, "ice burst the pipe[s]," and he "c[ould] see where [the pipes] exploded from the pressure of the ice."[39]  In contrast, concerning the damaged pipe below Ms. Sims's living room floor, Mr. Lopez testified clearly that "it wasn't a burst pipe."[40]  Rather, according to Mr. Lopez, the age and oxidized condition of the pipe was the culprit.[41]

### III.    Ms. Sims's Insurance Claim and the Instant Litigation

Ms. Sims filed a claim with State Farm to pay for the damages she incurred from the flooding incident.[42]  State Farm investigated Ms. Sims's claim.[43]  Following the investigation, State Farm sent Ms. Sims a letter denying her insurance claim.[44]  State Farm explained to Ms. Sims

---

[35] Ex. A (Lopez Dep.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 10.  At one point in his deposition, Mr. Lopez testified that "you could see rust and oxidation was causing the leak." Ex. 3 (Lopez Dep.) to Def.'s Mot. for Summ. J. (Doc. 27-3) at 3.  But, later, he testified that the pipe "had oxidation, not necessarily rust." *Id.* at 4 ("So I think that pipe -- well, it looked really old.  It had oxidation, not necessarily rust.  I'm not sure how to explain it, but it wasn't a burst pipe, no.").

[36] Ex. A (Lopez Dep.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 7–8.

[37] *See id.* at 8; Ex. 3 (Lopez Dep.) to Def.'s Mot. for Summ. J. (Doc. 27-3) at 3–4.  In his testimony, Mr. Lopez says only that he put the dirt back into the hole.  But the picture in the record confirms that the dirt he removed and then used to refill the hole with contained rocks.  *See* Ex. B-2 (Picture of the Leaky Pipe) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 12.

[38] *See* Ex. A (Lopez Dep.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 8–9; Ex. 3 (Lopez Dep.) to Def.'s Mot. for Summ. J. (Doc. 27-3) at 3.

[39] Ex. 3 (Lopez Dep.) to Def.'s Mot. for Summ. J. (Doc. 27-3) at 3.

[40] *Id.* at 4.

[41] *See supra* note 35.

[42] *See* Ex. C (Claim Denial Letter) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 14.

[43] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 33) ¶ 4.

[44] *See* Ex. C (Claim Denial Letter) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 14.

that it was denying her claim because the cause of the damage to her home fell within an exclusion under her insurance policy.[45]

In the letter, State Farm expressly noted that "[t]he damages found during [State Farm's] investigation [were] the result of a repeated or continuous leakage or seepage of water that [had] occurred over a period of time."[46]  And although State Farm did not expressly indicate other grounds for its denial, the letter also included references to other exclusion provisions of the insurance policy.[47]  These provisions included exclusions for (1) losses directly and immediately caused by wear, tear, decay, marring, scratching, deterioration, inherent vice, latent defect, mechanical breakdown, corrosion, electrolysis, or rust, and (2) losses that would not have happened in the absence of water or sewage below the surface of the ground, including water or sewage that exerts pressure on, or seeps or leaks through a building structure.

On April 21, 2023, Ms. Sims filed suit against State Farm in Pulaski County Circuit Court.[48]  State Farm removed the case to federal court on September 1, 2023.[49]  During discovery, State Farm hired Aaron Probst, a structural engineer, to evaluate Ms. Sims's home and to determine the cause of the flood.[50]  Among other things, Mr. Probst inspected Ms. Sims's home and analyzed Ms. Sims's water billing records from December of 2017 through February of

---

[45] *Id.*

[46] *Id.*

[47] *Id.* at 14–16.

[48] *See* Compl. (Doc. 2).

[49] *See* Notice of Removal (Doc. 1).

[50] *See* Ex. 4 (Probst Expert Report) to Def.'s Mot. for Summ. J. (Doc. 27-4) at 3, 29.

2020.[51]   Based on his overall investigation, Mr. Probst submitted an expert report, detailing his opinions as to the cause of the water damage.[52]

Mr. Probst's expert report includes a graph depicting Ms. Sims's water usage.[53]   The Court reproduces that graph here.



**Figure 3** – Rimkus-generated compilation of water usage data from water bills for the subject property (provided by Mr. McElroy).  The red arrow indicates the month that the sprinkler system was installed.

Mr. Probst explains the import of this graph thusly:

> In November and December, there were 1,496 more gallons used in 2019 than in 2018.  In January 2020, there were 2,244 more gallons used in 2020 than 2019. (The January 2020 usage was from December 10, 2019, to January 7, 2020.)  In February 2020, there were 3,740 more gallons used in 2020 than 2019.  (The

---

[51] *See id.* at 3, 12, 14–15.

[52] *See id.* at 4, 15.

[53] *Id.* at 12.

February 2020 usage was a 9-day period from January 7, 2020, to January 16, 2020.)  At this rate, the monthly usage would have been approximately 20,613 gallons.[54]

Based in part on the increased water usage year over year, Mr. Probst believes that the leak in Ms. Sims's pipe started in October of 2019 (50 gallons per day), got worse in December of 2019 (83 gallons per day), and significantly escalated in January of 2020 (590 gallons per day).[55]

The water table under Ms. Sims's home was somewhere between 0 and 12 inches.[56] Mr. Probst explains that, given the respective leakage rates discussed above, the water elevation level under Ms. Sims's home would have risen approximately 1.1 inches per month in October and November of 2019, 1.6 inches per month in December of 2019, and at least 0.4 inches per day in January of 2020.[57]  According to Mr. Probst, the leak took some time to supersaturate the soil beneath the concrete slab upon which Ms. Sims's home sat.[58]  And when the water level rose enough to make contact with the bottom of the concrete slab, the water then rose through preexisting cracks in the slab.[59]  The water then rose into and between the flooring of Ms. Sims's home.[60]

The foregoing background frames the legal analysis discussed below.  But before getting to that analysis, three additional points bear mentioning.  First, it is unclear whether Mr. Probst

---

[54] *Id.* at 14.  It is very important to understand how to read this graph.  As a general matter, and unless otherwise specified in the report, the water usage data for a particular month identified on the x-axis of the graph is the water usage for the 30 days ending on the seventh day of the month identified.  That means, for example, that the columns above October reflect water usage from September 7 to October 7 in 2018 and 2019, respectively.  In some significant sense, then, if we want to learn about how much water was used in a particular month in the real world, we should be looking at the data associated with the following month on the x-axis of the graph presented.

[55] *Id.*

[56] *Id.* at 15.

[57] *Id.*

[58] *See id.*

[59] *See id.*

[60] *See id.*

and Mr. Lopez agree or disagree on the underlying cause of the pipe leak. Mr. Lopez clearly attributes the leak to the old and oxidized condition of the pipe. But Mr. Probst is far less clear about what he believes caused the leak. On this point, his expert report says only:

> The hole that formed in the copper water line was due to improper installation of the water line.

***

> The hole that formed in the copper water line was due to improper installation of the water line. Photographs of the exposed line showed that the line from the water heater was not insulated but was rather in contact with the cold-water line. The backfill material should have consisted of fine soils with no rocks. There were numerous rocks visible around the copper lines in the area of the excavation.[61]

None of that expressly sets out Mr. Probst's opinion as to how the leak developed. Did the poor installation lead to oxidation, rust, rock-scraping, or other deterioration that weakened the pipe to the point of leakage? Or did a large rock puncture the pipe at a single point in time? Or was there some other failure mechanism resulting from the installation problem that Mr. Probst describes? We just don't know Mr. Probst's thoughts on the matter—because he did not tell us.[62]

Second, Mr. Probst and Mr. Lopez do appear to agree that the water damage to Ms. Sims's home resulted from a continuous leak occurring over a period of time. Mr. Probst expressly says this in his report.[63] As for Mr. Lopez, his testimony suggests that his old-and-oxidized-pipe theory is inconsistent with a large-scale-one-and-done pipe burst.[64] Indeed, Mr. Lopez specifically testified that the leak was not caused by a pipe burst.[65]

---

[61] *Id.* at 4, 15.

[62] State Farm's counsel suggests Mr. Probst was saying that, if there are rocks in the soil where a pipe is buried, the pipe can be damaged by the rocks when the pipe moves. *See* Mar. 11, 2025 Hr'g Tr. (rough) at 9:50:27–9:51:00. Of course, attorney argument is not evidence.

[63] *See* Ex. 4 (Probst Expert Report) to Def.'s Mot. for Summ. J. (Doc. 27-4) at 4, 15.

[64] *See* Ex. 3 (Lopez Dep.) to Def.'s Mot. for Summ. J. (Doc. 27-3) at 3.

[65] *See supra* note 35.

Third, Ms. Sims has provided no expert of her own to opine on the cause of the leak, the timing of the leak, and the condition of the pipe.  She has extremely limited evidence beyond her own testimony to dispute Mr. Probst's expert report or Mr. Lopez's testimony on these matters.  And her testimony itself is extremely limited in scope.  Her testimony boils down to the following: (1) she left the house for church and there were no signs of water damage; and (2) while at church, her house began to flood.  And the non-testimonial evidence on which she relies consists of only the size of the hole in the pipe and the amount of water gushing from it when Mr. Lopez turned the water back on.  From these data points, she argues, a jury could reasonably infer that there was an abrupt leak caused by a pipe burst.[66]

## LEGAL ANALYSIS

Summary judgment is proper if the moving party shows that (1) there is no genuine dispute as to any material fact, and (2) the moving party is entitled to judgment as a matter of law.[67]  If the moving party makes such a showing, the non-moving party must then present "specific facts, by affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial" to avoid summary judgment.[68]  Importantly, "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment . . . ."[69]  To survive summary judgment as a non-movant, the proffered dispute of fact must be both genuine and material.[70]  A genuine dispute of material fact only exists

---

[66] Ms. Sims does not even try to explain how the pipe burst.  And she does not provide any testimony on the condition of the pipe.

[67] *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)(2)).

[68] *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[69] *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[70] *See Torgerson*, 643 F.3d at 1042.

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[71] Given this standard, State Farm deserves summary judgment. Here's why.

In Arkansas, a plaintiff bringing a breach of contract claim must prove four elements: (1) "the existence of a valid and enforceable contract between the plaintiff and defendant"; (2) "the obligation of defendant thereunder"; (3) "a violation by the defendant"; and (4) "damages resulting to plaintiff from the breach."[72] A plaintiff's burden of proof is a preponderance of the evidence.[73] So, if this case were to move forward, Ms. Sims would eventually have to prove each of these four elements to a jury using the more-likely-than-not standard.

To survive at the present stage, then, Ms. Sims must proffer or point to record evidence from which a reasonable jury could ultimately rule in her favor. Among other things, Ms. Sims must show that a reasonable jury *could* conclude that she proved it is more likely than not that State Farm's policy covered the losses she suffered on and after January 12, 2020. Of course, Ms. Sims need not show that a reasonable jury actually would reach this conclusion. Rather, she need only show that a jury would not be unreasonable in reaching such a conclusion.[74]

As further explained below, the Court concludes that Ms. Sims has not shown that a reasonable jury could conclude the losses at issue in this case were covered by the relevant insurance policy. The Court analyzes each portion of the policy in turn.

---

[71] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[72] *Perry v. Baptist Health*, 358 Ark. 238, 244, 189 S.W.3d 54, 58 (2004).

[73] *See E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 49–50 (2025).

[74] Ms. Sims has an advantage in this endeavor. She gets the benefit of any genuinely disputed fact being resolved in her favor. She also gets the benefit of all reasonable inferences from all record facts. *See supra* p. 2.

## I.     Abrupt Discharge vs. Continuous Leak

Absent an applicable exclusion, Ms. Sims's insurance policy covers losses caused by "[a]brupt and accidental discharge or overflow of water."[75]  But it does not cover losses caused by leaks that "occur[] or develop[] over a period of time."[76]  And although the line between "abrupt" leaks and those that "occur[] or develop[] over a period of time" is not crystal clear, it is clear enough in the context of the instant case.  If the water damage to Ms. Sims's home was caused by a pipe burst on or shortly before January 12, 2020, then the damage falls within the insurance policy's coverage (subject, of course, to other potential exclusions).  On the other hand, if the water damage to Ms. Sims's home was caused by a months-long and continuously worsening pipe leak, then the damage is not covered.

In the Court's view, the record evidence strongly points to a months-long continuous leak. State Farm points to unrebutted evidence that the pipe in question did not simply burst open at one point in time.  First, Mr. Lopez specifically testified that the pipe did not burst.  His testimony was based on his personal observations of the pipe and his experience repairing leaks.  Moreover, the photograph of the pipe set out above bolsters that testimony.  The photograph shows significant oxidation of the pipe.  And the photograph does not contradict Mr. Lopez's testimony that the pipe showed no signs of outward expansion.

Second, Mr. Probst opined that the leak developed over months.  His expert opinion was based on, *inter alia*, a site visit, document review, and analysis of the home's water usage year

---

[75] Ex. 1 (Ins. Pol'y) to Def.'s Mot. for Summ. J. (Doc. 27-1) at 16.

[76] *Id.* at 18.  Other than the estoppel argument noted *infra* pp. 20–21, Ms. Sims does not argue that the insurance policy should cover her damages if the leak in question occurred or developed over a period of time.

over year.  That opinion is consistent with the water usage data, which shows a pattern of increasing year-over-year water usage from October 2019 through January of 2020.[77]

Third, Mr. Probst's opinion provides an unrebutted expert explanation for why the water suddenly appeared in Ms. Sims's home on January 12, 2020.[78]  To sum up Mr. Probst's explanation: (1) when the water started to leak from the pipe in October of 2019, it first went into the soil below Ms. Sims's home; (2) the water continued to leak into the soil until the soil became supersaturated and the water elevation came into contact with the concrete slab that supported Ms. Sims's house; and (3) the water then rose through preexisting cracks in the concrete slab and into Ms. Sims's house.[79]  Mr. Probst's point is that, because 16–18 inches of dirt, rocks, and concrete separated the leaky pipe from the house, no water would have come into contact with Ms. Sims's floorboards until the soil below became supersaturated.[80]  So it is no surprise that Ms. Sims did not notice any damage to her floorboards prior to the January 12, 2020 flood.[81]

Fourth, Mr. Probst's opinion also provides an unrebutted expert explanation for why— after not entering her home for months—a slow-developing and continuous leak would have caused so much water to appear so quickly in Ms. Sims's home on January 12, 2020.  According to Mr. Probst, for a long time, the water was simply going into the soil—slowly to begin with and then at increasing rates.  At the point that the water finally supersaturated the soil and rose into Ms. Sims's home on January 12, 2020, it was gushing out of the pipe at a very fast rate (about 590

---

[77] It is worth recalling that Mr. Lopez was hired by Ms. Sims to do the repair work.  Whatever one might think of Mr. Probst's motivation for opining in a manner favorable to State Farm, Mr. Lopez appears to have no skin in the game whatsoever.  Certainly, there's nothing in the record to suggest he has an ulterior motive for giving testimony beneficial to State Farm.

[78] *See* Ex. 4 (Probst Expert Report) to Def.'s Mot. for Summ. J. (Doc. 27-4) at 4.

[79] *See id.* at 4, 15.

[80] *See id.* at 14–15; Ex. 3 (Lopez Dep.) to Def.'s Mot. for Summ. J. (Doc. 27-3) at 2–4.

[81] *See* Ex. E (Sims Decl.) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 24.

gallons per day).[82]  And because the water could no longer go into the now-supersaturated soil, a significant portion of the now-gushing water found its way into Ms. Sims's home.  As a result, the flood in Ms. Sims's home progressed suddenly and quickly.

Despite the foregoing evidence, Ms. Sims argues that the water damage was caused by a "pipe . . . burst" on January 12, 2020.[83]  As evidence for her proposition, Ms. Sims first contends that "Mr. Lopez stated that Ms. Sims had a pipe that had burst . . . .[84]  But this contention is untrue, as even a quick examination of Ms. Sims's supporting citation shows.  Mr. Lopez was simply recalling what he was told when he was recruited for the job:

> Well, a gentlemen who's a client of mine, someone that I do concrete work for called me and said that he knows this lady who, I think he said, does his taxes.  But, anyways, he asked me if I could do a job for her, that she had a pipe burst and that it was under the floor.[85]

What Mr. Lopez was told—before anyone could actually see the pipe—is irrelevant.  Mr. Lopez has been consistent in his testimony that the pipe did not burst.

Ms. Sims's second contention is stronger (but not strong).  She explains that Mr. Lopez testified that the hole in the pipe was about one-eighth of an inch and that, when he turned the water back on, water gushed from the pipe.  And she notes that the photograph confirms the size of the hole and that the water was gushing out of the pipe.  Her point seems to be that a big hole, with a lot of water coming out of it, is evidence supporting the abrupt-leak theory and undermining the continuous-leak theory.  And she thinks that this is enough for a jury to reasonably infer an

---

[82] *See* Ex. 4 (Probst Expert Report) to Def.'s Mot. for Summ. J. (Doc. 27-4) at 14.

[83] Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34) at 1.

[84] *Id.* at 2.

[85] Ex. B (Lopez Dep.) to Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 33-1) at 6.

abrupt leak when it is combined with her personal testimony that (1) there were no signs of water in the house before that day, and (2) on that day, significant water flowed up into the house.

  This is a really close call. On the one hand, Mr. Probst's opinion does a pretty persuasive job of explaining away the otherwise common-sense intuition pushed by Ms. Sims. We are very close to a situation where one side provides a scientifically supported explanation of events and the other side provides guesswork that is fatally undermined by the scientific evidence. In that situation, summary judgment would be appropriate despite the common-sense appeal of the non-moving side's story.[86] On the other hand, although Mr. Probst's opinion (and the rest of the evidence proffered by State Farm) tells a compelling story, it does not make the abrupt-leak theory entirely impossible for a reasonable jury to believe. State Farm's evidence is not the type of slam-dunk evidence that so undermines an opposing theory as to render the issue unfit for trial. We are not, for example, talking about an indisputable video that obviously contradicts a person's testimony. In this vein, it is important to remember that, "at the summary judgment stage[,] the judge's function is not himself to weigh the evidence . . . ."[87] Instead, "[w]hen two opposing parties tell two different stories," a judge should resolve that dispute only when one of those stories "is blatantly contradicted by the record . . . ."[88] On this record, a reasonable jury could conclude that it is a hair more likely than not that the losses Ms. Sims suffered were a result of an "abrupt and accidental discharge . . . of water . . . from within a plumbing system." Therefore, summary

---

[86] A quick example might shine some light on the point the Court is trying to make. Imagine a plaintiff who claims the Sun moves around the Earth. She bases this claim on her daily observations that the Sun rises in the east and sets in the west. In a vacuum—that is, in the absence of any other record as to why this happens—her testimony might be enough to create a triable jury issue. But, where the record includes evidence from fact witnesses and experts explaining that the Earth moves around the Sun and that the plaintiff's observations are actually consistent with this evidence, the plaintiff's bare intuition is no longer enough to create a triable jury issue.

[87] *Anderson*, 477 U.S at 249.

[88] *Scott v. Harris*, 550 U.S. 372, 380 (2007).

judgment is only appropriate if State Farm shows, as a matter of law, that Ms. Sims's losses fall within some other applicable exclusion of coverage.

## II.    The Condition of the Pipe

Ms. Sims's insurance policy excludes any loss that is "directly and immediately caused by . . . wear, tear, decay, marring, scratching, deterioration, inherent vice, latent defect, [] mechanical breakdown[,] corrosion, electrolysis, or rust."  Accordingly, to survive summary judgment, Ms. Sims must proffer or point to evidence from which a reasonable jury could conclude that the leak was not directly and immediately caused by one of the foregoing problems with the pipe.

Ms. Sims neither proffers nor points to any evidence concerning the cause of the leak.  And Ms. Sims's "common-sense intuition" evidence discussed in the last section is of no help to her here.  Even though that evidence is enough (barely) to suggest the leak happened abruptly, it says nothing about why the leak occurred.  The only clear record evidence we have on why the leak occurred comes from Mr. Lopez.  Mr. Lopez says that the leak was caused by the old and oxidized condition of the pipe.[89]  And no evidence in the record suggests that a leak resulting from the old and oxidized condition of the pipe must happen slowly over time or can't happen abruptly.

In her summary judgment papers, Ms. Sims does not even argue that the leak was caused by something other than the old and oxidized condition of the pipe.  Instead, her sole response is to argue that State Farm should be judicially estopped from "using 'old pipe' as a basis for denying [her] claim."[90]  She says that, because State Farm knew that her home was 38 years old when it issued the insurance policy, State Farm should not be allowed to deny her claim based on the age

---

[89] This testimony is buttressed by the photograph of the pipe, showing oxidation and other signs of aging.  *See* Ex. B-2 (Picture of the Leaky Pipe) to Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34-1) at 12.

[90] Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34) at 10.

and oxidized condition of the pipe underneath her living room.[91]  Unfortunately for Ms. Sims, "[t]he general rule in Arkansas is that the doctrine of estoppel does not apply to extend the scope of coverage under an insurance policy."[92]  It is true, as Ms. Sims notes, that the Eighth Circuit recognized an exception to that general rule in *City of Carter Lake v. Aetna Casualty and Surety Co.*[93]  But that exception only applies when the "insurance company assumes the defense of an action . . . ."[94]  State Farm has not assumed the defense of an action in this case, and so the exception to the general rule does not apply.  Accordingly, Ms. Sims's judicial estoppel argument must be rejected.[95]

Notwithstanding the foregoing, the record reveals one potential dispute as to the cause of the pipe leak.  Recall the lack of clarity with which Mr. Probst stated his opinion as to the mechanism of failure in this case.[96]  Given the wording of his expert report, Mr. Probst's opinion might well be that the pipe leak was caused by a rock puncturing the pipe as opposed to the oxidation and aging of the pipe.  That is at least a reasonable reading of the report (though it is certainly not the only reasonable reading).  It is also the reasonable inference most favorable to Ms. Sims, and so it is the one the Court must adopt for summary judgment purposes.  Accordingly,

---

[91] *See id.*

[92] *Johnson v. Encompass Ins. Co.*, 355 Ark. 1, 10, 130 S.W.3d 553, 559 (2003).

[93] 604 F.2d 1052, 1059–60 (8th Cir. 1979).

[94] *Id.* at 1059.

[95] To the extent that Ms. Sims is arguing that State Farm somehow waived or forfeited their old-and-oxidized argument because it was not expressly presented in the initial denial-of-coverage letter, that argument is baseless.  Ms. Sims does not cite the Court to any cases—binding or otherwise—that suggest the propriety of extending waiver or forfeiture doctrines in this manner.  And the Court does not know of any such cases independently.  Moreover, Ms. Sims conceded the point at the summary judgment hearing.  *See* Mar. 11, 2025 Hr'g Tr. (rough) at 9:58:19–10:00:07.

[96] *See supra* p. 13.

there is some evidence from which a reasonable jury could conclude that the wear-tear-rust-corrosion exclusion provision does not apply.[97]

### III.     Water or Sewage Below the Surface of the Ground

State Farm makes one final exclusion-based argument.[98]  State Farm notes that Ms. Sims's insurance policy excludes "losses that would not have occurred in the absence of" water.  In this context, however, "water" has a very specific definition.  The Court provides that definition below, italicizing the portion of the definition (subparagraph 8) that State Farm relies on for its argument.

c.  **Water**, meaning;

(1)  flood;

(2)  surface water.  This does not include water solely caused by the release of water from a swimming pool, spigot, sprinkler system, hose, or hydrant;

(3)  waves (including tidal wave, tsunami, and seiche);

(4)  tides or tidal water;

(5)  overflow of any body of water (including any release, escape, or rising of any body of water, or any water held, contained, controlled, or diverted by a dam, levee, dike, or any type of water containment, diversion, or flood control device);

(6)  spray or surge from any of the items c.(1) through c.(5) described above, all whether driven by wind or not;

(7)  water or sewage from outside the ***residence premises*** plumbing system that enters through sewers or drains, or water or sewage that enters into and overflows from within a sump pump, sump pump well, or any other system designed to remove subsurface water that is drained from the foundation area;

---

[97] At the summary judgment hearing, State Farm argued that, even under the rock-puncture theory or something similar to it, the loss would be excludable under a separate provision dealing with losses caused by, *inter alia*, improper installation of the plumbing system.  *See* Mar. 11, 2025 Hr'g Tr. (rough) at 9:51:11–9:52:37; s*ee also* Ex. 1 (Ins. Pol'y) to Def.'s Mot. for Summ. J. (Doc. 27-1) at 20–21 (Section 1 Losses Not Insured, Subsection 3).  But that argument was not raised or developed in State Farm's brief, and the so the Court will not consider it for summary judgment purposes.  *See generally* Def.'s Br. in Supp. of Mot. for Summ. J. (Doc. 28).

[98] Def.'s Br. in Supp. of Mot. for Summ. J. (Doc. 28) at 8–9.

(8) *water or sewage below the surface of the ground, including water or sewage that exerts pressure on, or seeps or leaks though a **building structure**, sidewalk, driveway, swimming pool, or other structure*; or

(9) material carried or otherwise moved by any of the water or sewage, as descried in items c.(1) through c.(8) above.[99]

Keying off this policy language, State Farm's argument is exceedingly straightforward. Ms. Sims's loss was caused by water that entered her home through preexisting cracks in the slab. And, according to the insurance policy, the slab (and indeed, the rocks and dirt below it) constitute a building structure.[100]

Ms. Sims has made no argument countering the plain text construction of this provision that State Farm advances. In fact, Ms. Sims has provided no responsive argument at all with respect to this provision of the policy. No written argument in her summary judgment briefing. No oral argument at the summary judgment hearing. Complete silence.[101]

The Court agrees with State Farm's reading of the policy provision, and the Court agrees that it applies to exclude loss recovery here. Whatever the water was considered while it was inside the pipe, once the water left the pipe, it became "water below the surface of the ground." It then (undisputably) entered Ms. Sims's home through cracks in the slab.[102] And that counts as seeping or leaking through a building structure.

---

[99] Ex. 1 (Ins. Pol'y) to Def.'s Mot. for Summ. J. (Doc. 27-1) at 19–20 (emphasis added).

[100] *See id.* at 5 ("A building structure includes[,]" among other things, "slabs" and "gravel, stone, or sand, used as fill material and located not more than 12 inches directly below a slab . . . , including water supply lines, domestic water pipes, and sewer pipes located within this fill material . . . ."). To be clear, because there is evidence that the pipe might have been 13–14 inches below the slab, *see supra* p. 6, the pipe can't be considered part of the building structure for purpose of summary judgment. But the slab is. And so is the fill material that is 12 inches or fewer below the slab.

[101] If one were to assume that Ms. Sims's estoppel and waiver arguments apply here, they are rejected for the same reasons as discussed earlier in this Order. *See supra* pp. 20–21.

[102] *See* Ex. 4 (Probst Expert Report) to Def.'s Mot. for Summ. J. (Doc. 27-4) at 4, 15. Ms. Sims does not contest State Farm's evidence concerning how the water entered the house. She provided no evidence to suggest the water entered in any way other than through the slab.

The best counterargument that Court can come up with is that "water below the surface of the ground" does not include water that came from a below-ground pipe. The problem with this argument, however, is that subparagraph 8 is written broadly and does not include any such carve-out. Where the insurance policy wanted carve-outs, it included them. For example, subparagraph 2 carves out from "surface water" any "water solely caused by the release of water from a swimming pool, spigot, sprinkler system, hose, or hydrant."[103] Similarly, subparagraph 7 speaks of water or sewage "from outside the residence premises plumbing system . . . ."[104] Subparagraph 8, however, has no such limiting language. And the Court cannot create it out of thin air.

State Farm is therefore entitled to summary judgment. On this record, no reasonable jury could conclude that State Farm was obligated to pay Ms. Sims's losses resulting from the leak at issue in this case. That is because every reasonable jury would conclude that the water-below-the-surface exclusion applies to the leak at issue in this case.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's Motion for Summary Judgment.[105] But the Court will withhold the Final Judgment for 14 days. If Ms. Sims believes she has a winning argument (for summary judgment purposes) on the "water or sewage below the surface of the ground" policy provision, she may file a Supplemental Response on that point within 10 days of the date of today's Order. If Ms. Sims files a Supplemental Response, State Farm may file a Supplemental Reply within 10 days after the date on which Ms. Sims files her Supplemental Response. If a Supplemental Response is filed, the Court will withhold entry of the Final Judgment

---

[103] *See supra* pp. 22–23.

[104] *See id.*

[105] Doc. 27.

while it considers whether there is any reason to alter today's ruling.  Any Supplemental Response

and any Supplemental Reply are strictly limited to legal arguments concerning the construction

and/or applicability of the "water or sewage below the surface of the ground" policy provision.

Neither party may submit any further evidence whatsoever.[106]

IT IS SO ORDERED this 4th day of September 2025.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[106] State Farm developed this argument in a manner sufficient for consideration.  But the argument was not as developed as it should have been and neither party (nor the Court) discussed it at the hearing.  In these circumstances, additional briefing is justified.